**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| AFFILIATED COMPUTER SERVICES, INC., and ACS OUTSOURCING SOLUTIONS, INC., | § § § | |
| | § | Civil Action No. 3:10-cv-01709 |
| Plaintiffs, | § | |
| | § | **COMPLAINT** |
| vs. | § | |
| | § | JURY TRIAL DEMANDED |
| CINCOM SYSTEMS, INC., | § | |
| | § | |
| Defendant. | § | |

**COMPLAINT**

Affiliated Computer Services, Inc. ("ACS"), and ACS Outsourcing Solutions, Inc. ("ACS Outsourcing"), Plaintiffs, for Complaint against Cincom Systems, Inc. ("Cincom"), Defendant, state:

**A. NATURE OF THE ACTION**

1.      Cincom has claimed that ACS' mere access to certain Cincom software products constitutes copyright infringement. Cincom has made these allegations despite the fact that ACS' customers previously paid Cincom fees to obtain licenses to copy and install the same software on the computers to which ACS had access, and also despite the fact that ACS previously paid Cincom well in excess of two million U.S. dollars in "licensing" fees to obtain that access.

2.      Plaintiffs present this action to obtain the Court's declaratory judgment that Cincom's claims are without merit and that Cincom's attempt to use those claims in an effort to extract additional, duplicative, windfall "licensing" fees from ACS constitutes misuse of Cincom's copyrights.

**ORIGINAL COMPLAINT – Page 1**

## B. THE PARTIES

**3.**     ACS is a Delaware corporation with its principal place of business in Dallas, Texas.

**4.**     ACS Outsourcing, a wholly owned subsidiary of ACS, is a Michigan corporation with its principal place of business in Dallas, Texas.

**5.**     Upon information and belief, Cincom is an Ohio corporation with its principal place of business in Cincinnati, Ohio.  Cincom can be served with process at CT Corporation System, 1300 East Ninth Street, Cleveland, Ohio 44114.

## C. JURISDICTION AND VENUE

**6.**     This action arises under the provisions of the Copyright Act, Title 17 U.S.C. §§ 100, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question).

**7.**     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 (diversity), because the matter in controversy exceeds the sum or value of $75,000.00 and is between corporations incorporated in, and with their principal places of business in, different states.

**8.**     Venue is proper in the Northern District of Texas, Dallas Division, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred within this district and division.

**ORIGINAL COMPLAINT – Page 2**

## D. FACTS

### Party Backgrounds

9.      ACS is engaged generally in the business of providing information technology services and business process outsourcing solutions to businesses, government agencies, and non-profit organizations.

10.     ACS Outsourcing is engaged generally in the business of providing information technology services and business process outsourcing solutions to businesses.

11.     Upon information and belief, Cincom is engaged generally in the business of developing and publishing software for a variety of commercial purposes. Upon information and belief, that software includes several products marketed under the names SUPRA® and MANTIS®, among others.

12.     As of February 10, 2010 (the date ACS was acquired by Xerox corporation, as described below), ACS, either directly or through its affiliates, was delivering information technology services to three companies that had asked ACS, as a part of those services, to access software products published by Cincom. Those three companies were Pilkington North America, Inc. ("Pilkington"), Hallmark Cards, Inc. ("Hallmark"), and SIRVA, Inc.

### The Pilkington Nondisclosure Agreement

13.     Pilkington is a customer of ACS Outsourcing that is engaged generally in the business of manufacturing sheet glass.

14.     On or about **September 4, 1992**, The Genix Group, Inc., a Michigan corporation ("Genix Group"), signed an agreement with Cincom that conveyed to Genix Group the right to access certain Cincom software licensed by Genix Group's customers, which included the Libbey–

Owens–Ford Company, Pilkington's predecessor. A true and correct copy of that agreement is attached hereto as Exhibit A (the "Pilkington Nondisclosure Agreement").

15.     The purpose of the Pilkington Nondisclosure Agreement was to allow Genix Group to provide information technology services to those of its customers who, like Libbey–Owens–Ford, separately had acquired licenses to use the Cincom software products identified in the Pilkington Nondisclosure Agreement.

16.     On or about **June 21, 1996**, Genix Group finalized an agreement with ACS under which ACS acquired a controlling ownership interest in Genix Group. On or about **August 3, 1998**, Genix Group changed its name to ACS Outsourcing Solutions, Inc.; however, there was no change in the corporate structure of that entity. Detailed information regarding ACS' acquisition of Genix Group is a matter of public record.

17.     The Pilkington Nondisclosure Agreement does not convey any right to Genix Group or to ACS Outsourcing, independent of any Software License Agreements conveying Cincom software product licenses to Genix Group customers, such as Pilkington, to install, use or copy any Cincom software products.

### The Hallmark Nondisclosure Agreement

18.     Hallmark is a customer of ACS that is engaged generally in the business of manufacturing and selling greeting cards, gift wrap, party goods, giftware, stationery, electronic greetings, and ornaments

19.     On or about **June 30, 2004**, ACS signed a Cincom Limited License and Nondisclosure Agreement for Third Party Facility, a true and correct copy of which is attached hereto as Exhibit B (the "Hallmark Nondisclosure Agreement").

**ORIGINAL COMPLAINT – Page 4**

20.     The Hallmark Nondisclosure Agreement conveyed to ACS and "its affiliates" the right "*to have access to the proprietary computer software programs and related materials*" licensed to Hallmark by Cincom. (See Exhibit A at Paragraph 1.) The sole, stated purpose of the Hallmark Nondisclosure Agreement was "*to grant a limited license to* [ACS] *under which* [ACS] *will have access to the Products to fulfill its obligations to* [Hallmark] *that relate to the Products*." (See Exhibit A at Paragraph 2.)

21.     The Hallmark Nondisclosure Agreement does not convey any right to ACS, independent of the Cincom software licenses previously acquired by Hallmark, to access, use or copy any Cincom software products.

22.     The Hallmark Nondisclosure Agreement is silent as to ACS' right to assign or transfer its rights under the agreement to a surviving entity following a corporate acquisition, merger or restructuring of ACS.

   **The SIRVA Nondisclosure Agreement**

23.     SIRVA, Inc., is a customer of ACS that is engaged generally in the business of commercial and residential moving and relocation services.

24.     On or about **June 28, 2002**, ACS signed a Cincom Limited License and Nondisclosure Agreement for Third Party Facility, a true and correct copy of which is attached hereto as Exhibit C (the "SIRVA Nondisclosure Agreement").

25.     The SIRVA Nondisclosure Agreement conveyed to ACS and "its affiliates" the right "*to have access to the proprietary computer software programs and related materials*" licensed to NAVL by Cincom. (See Exhibit C at Paragraph 1.) The sole, stated purpose of the SIRVA Nondisclosure Agreement was "*to grant a limited license to* [ACS] *under which* [ACS] *will have*

**ORIGINAL COMPLAINT – Page 5**

*access to the Products to fulfill its obligations to* [NAVL] *that relate to the Products.*" (See Exhibit C at Paragraph 2.)

26.     The SIRVA Nondisclosure Agreement does not convey any right to ACS, independent of the Cincom software licenses previously acquired by NAVL, to access, use or copy any Cincom software products.

27.     The SIRVA Nondisclosure Agreement is silent as to ACS' right to assign or transfer its rights under the agreement to a surviving entity following a corporate acquisition, merger or restructuring of ACS.

### Subsequent Events

28.     On or about **February 8, 2010**, ACS finalized an agreement with Xerox Corporation under which Xerox acquired a controlling ownership interest in ACS. Following that acquisition, ACS, which at the time of the acquisition was, as it is now, a Delaware Corporation, merged with another Delaware corporation, named Boulder Acquisition Corporation, which also was wholly owned by Xerox. Boulder Acquisition survived that merger and subsequently changed its name to Affiliated Computer Services, Inc. Detailed information regarding Xerox's acquisition of ACS is a matter of public record.

29.     Notwithstanding the merger transaction, the status of ACS Outsourcing remains unchanged as of the date of this Complaint, and that entity legally remains the same Michigan corporation that executed the Pilkington Nondisclosure Agreement in 1992.

30.     By letter dated **June 22, 2010**, Cincom gave ACS notice of its belief that, following the consummation of the Xerox acquisition, any access or use by ACS of the Cincom software licensed to ACS' customers constitutes a "breach of contract" and "copyright infringement." In that letter and in subsequent correspondence, Cincom stated that ACS would be allowed to

**ORIGINAL COMPLAINT – Page 6**

continue to access that software only upon execution of a new "Software License Agreement" and payment of approximately three-and-a-half million U.S. dollars in "licensing" fees.

31.     SIRVA began the process of ceasing its use of Cincom's software products in 2009, and, as of June 30, 2010, it no longer is using any Cincom software products. Following ACS' receipt of Cincom's letter, Hallmark and Pilkington also have been engaging in the process of ceasing their use of Cincom's software products.

## E. FIRST COUNT

### Declaratory Judgment – There has been no Transfer or Conveyance of the Pilkington Nondisclosure Agreement

32.     Plaintiffs re-assert and incorporate by reference each and every matter pleaded in Paragraphs 1 through 31, above.

33.     Plaintiffs bring this claim for a declaratory judgment under both Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 and 2202.

34.     The legal entity that signed the Pilkington Nondisclosure Agreement in 1992 is the same legal entity providing services to Pilkington under the Pilkington Nondisclosure Agreement as of the date of this Complaint. In the years following Genix Group's execution of the Pilkington Nondisclosure Agreement, Genix Group was purchased by ACS, but it did not thereafter cease to exist following that transaction or any subsequent merger or corporate restructuring, nor did it ever attempt to assign or otherwise transfer the Pilkington Nondisclosure Agreement to ACS or to any other legal entity. The only notable change to the Genix Group corporate identity following the execution of the Pilkington Nondisclosure Agreement was the 1998 change of name to ACS Outsourcing Solutions, Inc., which did not entail any change to the entity's corporate structure.

**ORIGINAL COMPLAINT – Page 7**

**35.**    Under Michigan law, the mere purchase, by itself, of a controlling interest in a corporation does not serve to transfer or convey that corporation's contractual rights and obligations to the purchaser.

**36.**    Plaintiffs respectfully request that this Court issue its declaratory judgment that there has been no transfer or conveyance of the Pilkington Nondisclosure Agreement as a result either of the acquisition of Genix Group by ACS or as a result of the acquisition of ACS by Xerox.

**37.**    The above-requested declaratory judgment is necessary to prevent Cincom from asserting claims of direct or contributory copyright infringement against Plaintiffs, where those claims would arise out of any access to or use of the licensed software by ACS Outsourcing, following the acquisition of Genix Group by ACS or the acquisition of ACS by Xerox.

### F. SECOND COUNT

**Declaratory Judgment –    Consummation of the Merger Transaction did not Result in any Unauthorized Conveyance or Transfer of the Hallmark Agreement or of the SIRVA Agreement**

**38.**    Plaintiffs re-assert and incorporate by reference each and every matter pleaded in Paragraphs 1 through 31, above.

**39.**    Plaintiffs bring this claim for a declaratory judgment under both Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 and 2202.

**40.**    The question of whether a copyright licensee has assigned a license in violation of a license agreement is generally governed by state law, absent a conflict between the effect of applicable state law and a copyright owner's ability to protect his or her interest in a copyrighted work.

41.     Section 259(a) of Title 8 of the Delaware Code provides that, following the merger of two corporate entities, "*the rights, privileges, powers and franchises of each of said corporations…shall be vested in the corporation surviving or resulting from such merger or consolidation*," and "*all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation as they were of the several and respective constituent corporations.*"

42.     "New ACS" therefore acceded to the rights granted to "Old ACS" – under applicable state law there was no conveyance or transfer of the Hallmark Nondisclosure Agreement or the SIRVA Nondisclosure Agreement between the two entities.

43.     The effect of this result is not in conflict with Cincom's rights and interests as the owner of the copyrights in the software products licensed to Hallmark and to SIRVA. Cincom has received all payments owed to it under the agreements in question, and it is in precisely the same position with respect to "New ACS" and its access to Cincom's software products as it was with respect to "Old ACS" and its identical access to the very same software products.

44.     Plaintiffs respectfully request that this Court issue its declaratory judgment that consummation of the merger transaction between Xerox and ACS did not result in any unauthorized conveyance or transfer of the Hallmark Agreement or of the SIRVA Agreement in conflict with Cincom's copyrights in the software products licensed to Hallmark and to SIRVA, respectively.

45.     The above-requested declaratory judgment is necessary to prevent Cincom from asserting claims of direct or contributory copyright infringement against the Plaintiffs, where those claims would arise out of any post-merger access to or use by ACS, under the agreements in question, of the Cincom software licensed to Hallmark and SIRVA.

**ORIGINAL COMPLAINT – Page 9**

## G. THIRD COUNT

**Declaratory Judgment – The Hallmark Nondisclosure Agreement and the SIRVA Nondisclosure Agreement Both Allowed Boulder Acquisition to Access and Use the Cincom Software Licensed to Hallmark and SIRVA**

**46.**     Plaintiffs re-assert and incorporate by reference each and every matter pleaded in Paragraphs 1 through 31, above.

**47.**     Plaintiffs bring this claim for a declaratory judgment under both Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 and 2202.

**48.**     By their express terms, the Hallmark Nondisclosure Agreement and the SIRVA Nondisclosure Agreement both conveyed to ACS' "affiliates" the right to access and use the Cincom software licensed to Hallmark and to NAVL, respectively. (See Exhibit A at Paragraph 1 and Exhibit C at Paragraph 1.) Neither the Hallmark Nondisclosure Agreement nor the SIRVA Nondisclosure Agreement provides a definition of the term "affiliate" to be used in interpreting the agreement.

**49.**     Upon Xerox's acquisition of ACS, ACS and Boulder Acquisition became affiliates, under the commonly accepted meaning of the term "affiliate."

**50.**     As an affiliate of ACS following Xerox's acquisition of ACS, Boulder Acquisition acquired the same rights to access and use the Cincom software products licensed to Hallmark and to SIRVA that ACS acquired when it signed the Hallmark Nondisclosure Agreement and the SIRVA Nondisclosure Agreement.

**51.**     Plaintiffs respectfully request that this Court issue its declaratory judgment that the Hallmark Nondisclosure Agreement and the SIRVA Nondisclosure Agreement both allowed

**ORIGINAL COMPLAINT – Page 10**

Boulder Acquisition (n/k/a ACS) to access and use the Cincom software licensed to Hallmark and SIRVA.

52.     The above-requested declaratory judgment is necessary to prevent Cincom from asserting claims of direct or contributory copyright infringement against Plaintiffs, where those claims would arise out of any post-merger access to or use by ACS of the Cincom software licensed to Hallmark and SIRVA.

## H. FOURTH COUNT

**Declaratory Judgment – Transfer of the Hallmark Agreement or of the SIRVA Agreement Cannot Form the Basis of a Copyright Infringement Claim**

53.     Plaintiffs re-assert and incorporate by reference each and every matter pleaded in Paragraphs 1 through 31, above.

54.     Plaintiffs bring this claim for a declaratory judgment under both Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 and 2202.

55.     The owner of the copyright in a computer program has the exclusive rights (1) to reproduce the computer program in copies; (2) to prepare derivative works based upon the computer program; and (3) to distribute copies of the computer program to the public by sale or other transfer of ownership, or by rental, lease, or lending. 17 U.S.C. § 106.

56.     U.S. copyright law does not give the owner of the copyright in a computer program the exclusive right to use or access a computer program that is installed lawfully on a computer system.

57.     ACS did not and does not require a license to exercise any of the exclusive rights afforded to Cincom under U.S. copyright law in order to provide ACS' information technology

**ORIGINAL COMPLAINT – Page 11**

services to Hallmark or to SIRVA. The Hallmark Nondisclosure Agreement and the SIRVA Nondisclosure Agreement convey no such independent license to ACS, and they therefore do not implicate U.S. copyright law.

58.     Plaintiffs respectfully request that this Court issue its declaratory judgment that the Hallmark Nondisclosure Agreement and the SIRVA Nondisclosure Agreement do not convey to ACS any independent license to exercise any of the exclusive rights afforded to Cincom under U.S. copyright law and that those agreements therefore do not implicate U.S. copyright law and cannot, as a matter of law, even if transferred by ACS to a different legal entity, form the basis of a copyright infringement claim by Cincom.

59.     The above-requested declaratory judgment is necessary to prevent Cincom from asserting claims of direct or contributory copyright infringement against the Plaintiffs, where those claims would arise out of any post-merger access to or use by ACS of the Cincom software licensed to Hallmark and SIRVA.

## I. FIFTH COUNT

### Declaratory Judgment –  Cincom has Misused its Copyrights

60.     Plaintiffs re-assert and incorporate by reference each and every matter pleaded in Paragraphs 1 through 31, above.

61.     Plaintiffs bring this claim for a declaratory judgment under both Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 and 2202.

62.     Under the doctrine of copyright misuse, courts may refuse to aid a copyright holder using its copyright in a manner that is violative of the public policy embodied in the grant of a copyright.

63.     Cincom has asserted claims of copyright infringement and has demanded that ACS enter into new "licensing" transactions with Cincom in the amount of approximately three-and-a-half million U.S. dollars, even though Cincom already has received software licensing fees from Pilkington, Hallmark and SIRVA, along with software access fees from pre-acquisition ACS well in excess of two million U.S. dollars, and further even though Cincom stands in exactly the same position with regard to post-acquisition ACS and its use of Cincom's software products, as it did with pre-acquisition ACS and its identical use of the very same software products.

64.     Cincom's actions constitute copyright misuse, in that they embody a practice of using software copyrights in a deceptive manner to extract windfall "licensing" fees from its customers and their support vendors, rather than to protect the copyrighted works against unauthorized use.

65.     Plaintiffs respectfully request that this Court issue its declaratory judgment that Cincom's deceptive practice of asserting claims for windfall "licensing" fees constitutes copyright misuse and acts as a bar against a court's award of injunctive or monetary damages based upon such use.

66.     The above-requested declaratory judgment is necessary to prevent Cincom from asserting claims of copyright infringement against Plaintiffs, where those claims are the product, in whole or in part, of Cincom's misuse of copyrights allowed under U.S. law.


### J. SIXTH COUNT

**Declaratory Judgment –   Remedies for any Past Alleged Infringement of Cincom's Copyrights are Barred by the Doctrine of Laches**

67.     Plaintiffs re-assert and incorporate by reference each and every matter pleaded in Paragraphs 1 through 31, above.

68.     Plaintiffs bring this claim for a declaratory judgment under both Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 and 2202.


**ORIGINAL COMPLAINT – Page 13**

69.     The doctrine of laches may be invoked where a party has unreasonably and inexcusably delayed in prosecuting its rights and where that delay has resulted in material prejudice to the party against whom remedies for allegedly infringing activities otherwise would be sought. The effect of laches is to withhold damages for infringement which occurred prior to the filing of the suit.

70.     Even if ACS' acquisition of Genix Group may be characterized as a transfer of the Pilkington Nondisclosure Agreement, and even if such a transfer may be characterized as having been to the detriment of Cincom's copyright interests in the computer programs licensed to Pilkington, Cincom knew or should have known well before 2010 that ACS acquired Genix Group in 1996. However, in contrast to its actions following ACS' merger with Xerox, Cincom never gave any notice to ACS that it objected to ACS' access to and use of the Cincom software products identified in the Pilkington Nondisclosure Agreement in order to continue providing information technology services to Pilkington.

71.     ACS justifiably relied on the absence of any claims by Cincom of alleged copyright infringement arising out of such access and use in continuing to provide information technology services to Pilkington following its acquisition of Genix Group and in continuing to provide substantially similar services to Hallmark and SIRVA following the acquisition by Xerox.

72.     Plaintiffs respectfully request that this Court issue its declaratory judgment that Cincom unreasonably delayed in prosecuting claims of alleged copyright infringement arising out of the kind of corporate restructuring presently at issue, and, by operation of the doctrine of laches, that as a result of that delay Cincom may not seek any remedies for any alleged copyright infringement arising out of such corporate restructuring, where such alleged infringement

**ORIGINAL COMPLAINT – Page 14**

occurred prior to the date of any lawsuit that Cincom may file in the future claiming such infringement.

**73.**     The above-requested declaratory judgment is necessary to prevent Cincom from seeking remedies against Plaintiffs for claims of past copyright infringement, where any need for those remedies could have been avoided by Plaintiffs and their customers, but for Cincom's unreasonable delay in prosecuting such claims.

## K. PRAYER FOR RELIEF

**WHEREFORE**, Affiliated Computer Services, Inc., and ACS Outsourcing Solutions, Inc., respectfully demand that judgment be entered in their favor and against Cincom Systems, Inc., and that said Plaintiffs be granted the following relief:

    i.    Entry of a declaratory judgment that there has been no transfer or conveyance of the Pilkington Nondisclosure Agreement as a result either of the acquisition of Genix Group by ACS or as a result of the acquisition of ACS by Xerox.

    ii.    Entry of a declaratory judgment that consummation of the merger transaction between Xerox and ACS did not result in any unauthorized conveyance or transfer of the Hallmark Agreement or of the SIRVA Agreement in conflict with Cincom's copyrights in the software products licensed to Hallmark and to SIRVA, respectively.

    iii.    Entry of a declaratory judgment that the Hallmark Nondisclosure Agreement and the SIRVA Nondisclosure Agreement both expressly allowed Boulder Acquisition (n/k/a ACS) to access and use the Cincom software licensed to Hallmark and SIRVA.

    iv.    Entry of a declaratory judgment that the Hallmark Nondisclosure Agreement and the SIRVA Nondisclosure Agreement do not convey to ACS any independent license to exercise any of the exclusive rights afforded to Cincom under U.S. copyright law and that those agreements therefore do not implicate U.S. copyright law and cannot, as a matter of

**ORIGINAL COMPLAINT – Page 16**

law, even if transferred by ACS to a different legal entity, form the basis of a copyright infringement claim by Cincom.

v.   Entry of a declaratory judgment that Cincom's deceptive practice of asserting claims for windfall "licensing" fees based merely on the fact that ACS was acquired by Xerox constitutes copyright misuse and acts as a bar against a court's award of injunctive or monetary damages based upon such use.

vi.   Entry of a declaratory judgment that Cincom unreasonably delayed in prosecuting claims of alleged copyright infringement arising out of the kind of corporate restructuring presently at issue, and, by operation of the doctrine of laches, that as a result of that delay Cincom may not seek any remedies for any alleged copyright infringement arising out of such corporate restructuring, where such alleged infringement occurred prior to the date of any lawsuit that Cincom may file in the future claiming such infringement.

vii.   Any such other and further relief as the Court may deem appropriate.

**ORIGINAL COMPLAINT – Page 17**

Respectfully submitted,

/s/ *Robert J. Scott*
Robert J. Scott, Texas Bar No. 24010385
rjscott@scottandscottllp.com
SCOTT & SCOTT LLP
2200 Ross Avenue, Suite 5000
Dallas, Texas 75021
Telephone: (214) 999-0080
Facsimile: (214) 999-0333

Attorneys for Plaintiffs
AFFILIATED COMPUTER SERVICES, INC., and
ACS OUTSOURCING SOLUTIONS, INC.